Matthew W. Ruan (SBN 264409)
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@fklmlaw.com

*Attorneys for Plaintiff and the Putative Class*
[Additional counsel listed on signature page.]

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRISHA NADEAU, individually and on behalf of all others similarly situated,<br><br>　　　　　*Plaintiff,*<br><br>　　　　　v.<br><br>GOOGLE LLC, a Delaware limited liability company,<br><br>　　　　　*Defendant.* | Case No.:<br><br>**CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL FOR:**<br><br>**Violation of 18 U.S.C. § 2511**<br>**Common Law Invasion of Privacy –**<br>**Intrusion Upon Seclusion** |

## CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Trisha Nadeau ("Plaintiff"), individually and on behalf of all other persons similarly situated, by and through her attorneys, makes the following allegations pursuant to the investigation of counsel and based upon information and belief, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, which are based on personal knowledge.

## NATURE OF THE ACTION

1. Americans routinely rely on the internet for deeply personal purposes—such as researching medical treatments, engaging with religious texts, obtaining guidance on raising children, and consuming other sensitive information—with the reasonable belief that their identities and online activity will not be covertly captured or disclosed to foreign technology companies accountable to the Chinese government.

CLASS ACTION COMPLAINT

As alleged herein, Google LLC ("Google") has betrayed that expectation and violated federal and state law by doing precisely that.

2. Google controls and operates the largest digital advertising platform in the world, generating approximately $307.4 billion in annual revenue, the overwhelming majority of which is derived from advertising-related activities.

3. Through its expansive advertising technology stack, Google collects detailed information about Americans' internet usage and assigns unique digital identifiers that enable the tracking of individuals across websites, mobile applications, and devices. Google disseminates this personal information at enormous scale, without meaningful disclosure or legally valid consent, to third-party advertising participants in its ecosystem—including, *inter alia*, entities owned by, affiliated with, or subject to the jurisdiction of the People's Republic of China, such as Pangle, an advertising platform operated by the Chinese parent of TikTok and Temu, in violation of federal regulations, federal wiretapping laws, and California's privacy, wiretapping, and computer fraud statutes.

4. These entities are subject to Chinese legal regimes that mandate cooperation with state intelligence services and create a substantial risk that private user data will be accessed by the Chinese government.

5. In April 2025, the federal government enacted the Bulk Sensitive Data Rule ("BSDR"), which categorically bars the commercial transfer of Americans' bulk sensitive personal data—including IP addresses and persistent online identifiers—to entities subject to the jurisdiction of countries designated as foreign adversaries, including China. The rule reflects a formal determination that such transfers constitute an "unusual and extraordinary threat" to United States national security.

6. Google's cookie-syncing practices and real-time bidding processes violate the BSDR by facilitating precisely the type of prohibited data transfers the rule was designed to prevent.

7. To effectuate these unlawful transfers, Google intentionally intercepts users' electronic communications, thereby invading Americans' privacy in violation of the Electronic Communications Privacy Act ("ECPA" or the "Federal Wiretap Act"), 18 U.S.C. § 2511(2)(d). As a result, Google is liable

CLASS ACTION COMPLAINT

to every American whose communications were intercepted and whose personal data was transmitted to covered foreign persons. Google's conduct also violates Michigan common law, as set forth below.

**PARTIES**

8. Plaintiff Trisha Nadeau is an individual citizen of Michigan and Dansville resident. Ms. Trisha was in Michigan when she visited Drugs.com.

9. Defendant Google LLC, a wholly owned subsidiary of Alphabet Inc., is a limited liability company organized under the laws of Delaware, with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, California 94043.

**JURISDICTION AND VENUE**

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because this is a class action in which the amount in controversy exceeds $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from the Defendant.

11. This Court also has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, specifically the Electronic Communications Privacy Act, 18 U.S.C. § 2510 *et seq*.

12. This Court has supplemental jurisdiction over Plaintiff's state-law claim under 28 U.S.C. § 1367 because those claims arise from the same case or controversy as Plaintiff's federal claims under the ECPA.

13. This Court has personal jurisdiction over Defendant because Google is headquartered in and maintains its principle place of business in this District. Google also conducts substantial and continuous business within this District, including developing and operating its technology that gives rise to the claims herein.

14. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (b)(2) because Defendant resides in this District and because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

CLASS ACTION COMPLAINT

**FACTUAL ALLEGATIONS**

**A.  The Bulk Sensitive Data Rule**

15.    The Bulk Sensitive Data Rule ("BSDR") originates in Executive Order 14117, in which the President of the United States determined that the transfer of Americans' bulk sensitive personal data to countries of concern, including the People's Republic of China, presents a national security risk. The Executive Order reflects a shift in federal national security policy that recognizes foreign adversaries can obtain sensitive information about U.S. persons through ordinary commercial data flows, not only through cyber intrusions or traditional espionage.

16.    The Department of Justice implemented Executive Order 14117 through the Data Security Program, administered by the National Security Division and codified at 28 C.F.R. Part 202. The Department of Justice has explained that the program is intended to prevent countries of concern from gaining access to Americans' bulk sensitive personal data through common commercial practices, including data brokerage, advertising technology, and cross-border data sharing. As a senior Justice Department official explained, the BSDR aims to stop foreign governments from sidestepping American cybersecurity protections entirely: "[W]hy would you go through the trouble of complicated cyber intrusions and theft to get Americans' data when you can just buy it on the open market or force a company under your jurisdiction to give you access? . . . The [BSDR program] makes getting that data a lot harder."

17.    At a high level, the BSDR prohibits "covered data transactions," defined as transactions that involve the transfer of bulk sensitive personal data to a "covered person" through specified transaction types, including "data brokerage." See 28 C.F.R. §§ 202.210, 202.301(a). Whether a given transfer is prohibited turns on what data is being transferred, to whom, in what volume, and through what type of transaction.

18.    Among the transaction types the BSDR regulates is "data brokerage," defined as the sale of data, licensing of access to data, or similar commercial transactions involving the transfer of data from any person to any other person, where the recipient did not collect or process the data directly from the individuals linked or linkable to the data. See 28 C.F.R. § 202.214(a).

19.    The BSDR defines a set of "listed identifiers" that includes, among other items, device

4

CLASS ACTION COMPLAINT

identifiers, IP addresses, and cookie data. See 28 C.F.R. § 202.234(g). A listed identifier becomes a "covered personal identifier," and therefore "sensitive personal data" regulated by the BSDR, when it is transferred in combination with any other listed identifier, or in combination with other data such that it is linked or linkable to other listed identifiers or to other sensitive personal data. See 28 C.F.R. §§ 202.212(a), 202.249(a).

20.    The BSDR's prohibitions apply when sensitive personal data is transferred in "bulk." For covered personal identifiers, the rule defines bulk as data relating to 100,000 or more U.S. persons during a 12-month period. See 28 C.F.R. § 202.205.

21.    The BSDR prohibits transfers when the recipient is a "covered person," defined as any foreign person that is at least 50% owned by, directly or indirectly, a country of concern. See 28 C.F.R. § 202.211(a). The People's Republic of China is expressly designated as a country of concern.

22.    The BSDR provides for both civil and criminal penalties for violations, underscoring the national security significance of the rule. See 28 C.F.R. § 202.1301.

### B. Public IP Addresses

23.    A public IP address is a globally unique numerical identifier that guides or routes communications across the internet. Often written as four sets of numbers separated by periods (e.g., 192.555.455.145), Internet Service Providers assign public IP addresses to networking devices such as modems or routers (including household modems and routers).

24.    Public IP addresses function as the essential addressing system of the internet. Just as a telephone number is a unique number necessary to route a phone call to the correct household, a public IP address is a unique number necessary for routing internet communications to the correct location. And just as a phone number can reveal the general location of the caller, a public IP address reveals the geographic location of the internet user. For example, free online "IP lookup" services such as iplocation.io use databases that map IP addresses to geographic areas—often providing information about the country, city, county, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP address.

CLASS ACTION COMPLAINT

25. The geolocation capability of public IP addresses makes them extraordinarily valuable for digital advertising and tracking purposes. Public IP addresses can allow companies to target advertisements to users in specific geographic areas with 95% accuracy. For example, businesses who are trying to reach specific demographics can target devices on college campuses by sending advertisements to IP addresses associated with college-wide Wi-Fis or associated with particular events, such as job fairs or festivals. By using public IP addresses to target specific households, businesses or events based on their location, advertisers can avoid wasting money on ads unlikely to be seen by their target audience.

26. Moreover, public IP addresses allow businesses to track user interactions and behaviors across multiple websites, building detailed profiles of users' browsing habits and preferences tied to their location. They are particularly powerful for identifying and tracking specific individuals. When individuals use their devices across different locations (such as home, work, coffee shops, or other locations), each location will have its own public IP address. By tracking these patterns of movement between different IP addresses, companies can build detailed profiles of individual users' daily routines and behaviors, which may distinguish them from others who may be accessing the internet through the same public IP address (such as other members of the same household). For example, if a user accesses websites on their laptop from their home IP address in the morning, their work IP address during the day, and then their home IP address again in the evening, this creates a unique pattern that can identify that specific individual. When combined with other information collected by trackers (such as browser type, device type, and user behavior), these IP address patterns allow companies to identify and track specific individuals with remarkable precision, even when multiple people share the same IP address at a given location.

27. For these reasons, Europe's General Data Protection Regulation regards IP addresses as "personal data, as they can potentially be used to identify an individual."

28. Public IP addresses are not "public" in the sense that they are openly accessible or discoverable at large. If a user is not actively transmitting data packets, their public IP address remains "private" and is not exposed to the broader internet. Rather, the term "public IP address" is used in

6

CLASS ACTION COMPLAINT

contradistinction to the term "private IP address," which refers to a different type of IP address used within internal networks, which is not routable on the public internet, and which does not reveal anything about a user's geolocation.

29.    A public IP address constitutes "routing, addressing, or signaling information."  It is "routing" or "signaling" information because it sends or directs the user's communication from the router in their home or work to the website they are communicating with, ensuring that the web content being accessed (whether that be websites, streaming content, emails, or other data) reaches the user correctly. It is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

30.    As outlined below, Google uses its tracking technologies installed onto the websites for marketing and commercial purposes. Among other personally identifying information, these tracking technologies collect users' public IP addresses that identify the outgoing "routing, addressing, or signaling information" of the user.

### C. Websites and Tracking Technologies

31.    When a user visits a website, their web browser must communicate with the website's server to load the page content. This communication happens through an "HTTP request" or "GET" request sent from the user's browser to the website's server. The server then responds with an "HTTP response" containing instructions for displaying the webpage, including what text should appear and where, what images should load, and what music should play. A general diagram of the process is shown below.



CLASS ACTION COMPLAINT

32. During this process, the server's HTTP response process may also cause third-party trackers to be installed on a user's browser. The trackers are invisible pieces of code that can cause the browser to send information to a third party, including (as relevant here) the user's public IP address and details about the user's device (make, model, operating system), browser information, and other persistent identifiers.

33. If the same third-party tracker is present across multiple websites, it can build a comprehensive profile of users by combining data from different sources. This enables sophisticated tracking of individuals' browsing habits, preferences, and behaviors across the internet.

34. Businesses often incorporate these third-party tracking technologies into their websites' code for various purposes, including collecting and analyzing user data; monitoring website interactions; enabling targeted advertising; measuring advertising effectiveness; and generating revenue through data sharing and targeted advertising.

35. Part of the way that online trackers, such as those at issue here, typically operate includes the installation and reading of cookies on users' browsers. A cookie is a small text file containing data that a website's server creates and transmits to a web browser, which then stores the file on the user's device. When a user revisits a website, the tracker can access the information stored in the cookie, allowing it to recognize the user, thereby helping the tracker to continue building their profile. These cookies can persist from a few days to several years, enabling long-term tracking and profiling.

36. When the same online trackers are utilized across multiple websites, they can use their code operating on the users' browsers to build a comprehensive profile of users by combining data from different sources. This enables sophisticated tracking of individuals' browsing habits, preferences, and behaviors across the internet.

37. The installation and operation of Google's tracking technologies and their related cookies occurs automatically and invisibly when users visit websites. Users are typically unaware that their data is being collected and transmitted to third parties or that information is being intercepted from their device's communications, as the processes happen in the background without any visible indication.

**D. Google's Collection and Advertising Business**

CLASS ACTION COMPLAINT

38.     Website users who visit third-party websites do not knowingly communicate with Google or direct any information to Google's advertising systems. Instead, a user's browser sends requests to the websites the user choses to visit, and Google's advertising code—embedded in that website by the publisher—copies and transmits the contents of those communications to Google. Users receive no service from Google in connection with these transmissions, have no direct relationship with Google's advertising infrastructure on third-party sites, and are given no practical means to observe, control, or prevent Google's acquisition of their browsing activity.

39.     Google maintains and operates the largest digital advertising ecosystem in the world. Through products such as Google Ads, Google Ad Manager, Google Publisher Tag, Google Ad Exchange, and the underlying DoubleClick technology, Google's advertising and tracking code is integrated into an enormous number of websites—likely numbering in the millions—across virtually all categories of online content. When a user loads one of these websites, Google's code automatically executes within the user's browser and sends information about the user's visit to Google-controlled servers, including servers hosted at doubleclick.net and related domains.

40.     In the course of these automatic transmissions, Google's tracking technology captures far more than basic technical signals. Each request to a webpage contains the full URL, including path and query string, which reveals the specific content the user seeks to access or the search terms the user has entered. The same request also includes referrer information identifying the page from which the user navigated. Taken together, this information reveals what the user is viewing, reading, or searching for, and how the user moves through a website—conveying the substance, purport, and meaning of the user's interaction with that site. Google acquires this information in real time, while the user's communication with the website is ongoing, and transmits it to Google's servers alongside persistent user identifiers.

41.     Google's advertising infrastructure relies on persistent cookies, including the IDE and DSID cookies, which Google places on and retrieves from users' browsers. These cookies enable Google to recognize the same browser across different websites and browsing sessions. The DSID cookie is tied to a user's Google account, allowing Google to associate browsing activity on third-party websites with a known individual when that user is logged into services such as Gmail or YouTube in the same browser.

9

CLASS ACTION COMPLAINT

The IDE cookie functions independently of account login status and allows Google to continue tracking and profiling users even when they are not logged into a Google account. Through the combined use of these cookies and its embedded tracking scripts, Google compiles detailed, personally identifiable records of users' online behavior over time as they traverse the internet.

### E. Google's Disclosure and Use of User Data

42. Google's advertising business is not limited to internal data use. Rather, Google monetizes user information by distributing it to third-party advertising companies in connection with the sale of advertising space on websites that incorporate Google's advertising technology. Google's advertising operations generate approximately $307.4 billion in annual revenue, accounting for the substantial majority of the company's overall income.

43. The transmission of user data to third parties occurs primarily through Google's real-time bidding ("RTB") system. Each time a user visits a webpage that employs Google's advertising tools, Google initiates an automated auction to determine which advertisement will be shown. Within milliseconds, Google issues bid requests to advertising companies that it has authorized to participate, evaluates incoming bids, selects a winner, and delivers the resulting advertisement to the user. Google designs, operates, and controls each component of this process, including the auction mechanics, ad delivery, and partner eligibility.

44. In order to allow bidders to assess the value of an impression and determine how much to bid, Google includes detailed information in its bid requests, including the URL of the page the user is viewing, referrer data indicating the page from which the user navigated, the user's IP address, IP-based geolocation data, and cookie-related identifiers and other data. These bid requests may contain audience classification signals consisting of approximately 2,000 standardized user attributes—as well as content classification signals, which categorizes the subject matter of webpages and applications, including highly sensitive topics such as bankruptcy, mental health conditions, substance use, sexual health, and specific religious affiliations. Google's RTB framework also discloses users' IP addresses to advertising partners.

45. Additionally, Google operates a "cookie syncing" or "cookie matching" system as part of its RTB infrastructure. Through this process, Google shares a proprietary advertising identifier known as

CLASS ACTION COMPLAINT

the Google GID with its advertising partners. Unlike browser-based cookies such as IDE or DSID, the Google GID is not stored on the user's device. Instead, it is embedded directly into communications between Google and its partners. Because each advertising company assigns its own unique identifier to users—and cannot read identifiers assigned by other companies—cookie syncing enables partners to associate Google's identifier with their own records for the same individual.

46.    Once cookie syncing has occurred, an advertising partner that receives a bid request from Google can recognize the same user across subsequent auctions, retrieve information previously associated with that user in the partner's own systems, and tailor its bidding behavior accordingly. Through this mechanism, Google enables its partners to persistently identify and track users over time using the Google GID and related data transmitted during the bidding process.

47.    For example, Google intercepts users' communications with Drugs.com and many other websites, together with other users' information and identifiers, in this fashion. The example of Drugs.com reflects the ordinary operation of Google's advertising systems on websites containing sensitive user information. In each such instance, the processes described occur automatically during and after page load, without any affirmative action by the user. Google's tracking code intercepts the contents of users' communications with these websites, such as Drugs.com, including URLs containing sensitive search terms and page content, and transmits those contents to Google's servers alongside persistent identifier cookies linked to users' identities and IP addresses. Through the RTB auction process, Google transmits the user's Google GID to Chinese-affiliated advertising partners through its cookie syncing process, and, through its RTB bid requests, shares with those same partners the URL of the page being viewed, the user's IP address, and other identifying information. The result is that Google both intercepts the substance of Americans' sensitive browsing activity and transmits their persistent identifiers and personal data to advertising entities subject to the jurisdiction of the People's Republic of China.

48.    Drugs.com is a health information website that provides drug interaction tools, medication guides, and information about prescription drugs and medical conditions. User visits to the site may reveal sensitive information about an individual's health conditions, medications, and treatment decisions. When users browse Drugs.com, Google's tracking code intercepts the substance of their browsing activity,

11

CLASS ACTION COMPLAINT

including search terms entered and pages viewed, and transmits it to Google's DoubleClick infrastructure alongside the user's identifying cookies, IP address, and device information. For example, a search for "lithium" or a visit to an article on opioid safety transmits those terms within the URLs to Google in the same manner as any other user interaction with the site. As part of the RTB process on Drugs.com, Google transmits the user's Google GID to MediaGo (identified internally in Google's systems as baidu_mediago), Pangle (identified internally as toutiao_usd), and Temu (identified internally as whaleco_services_llc), and shares with these partners the URL of the page the user is viewing (which includes sensitive medical search terms and the names of the pages viewed), the user's IP address, IP-derived geolocation, and cookie data.

49. This example is illustrative, not exhaustive. Google's advertising and cookie syncing infrastructure is deployed across a vast number of websites spanning sensitive categories including health, religion, parenting, finance, and many others. In each instance, Google intercepts the contents of users' communications with these websites and transmits their persistent identifiers and personal data to Chinese-affiliated advertising partners without any meaningful notice to or consent from the user.

50. Google's RTB framework also entails the disclosure of users' IP addresses to advertising partners. An IP address is a globally unique numerical label that facilitates internet communications and reveals a user's approximate geographic location. Publicly available IP lookup services can associate an IP address with a country, city, and approximate physical coordinates with greater than 95 percent accuracy. When combined with persistent advertising identifiers, IP address data allows advertising companies to distinguish individual users, even as they move between locations such as home, work, and other environments, and to infer patterns in users' daily activities and routines.

51. Through the combined operation of RTB auctions, cookie syncing, and identifier sharing, Google's advertising infrastructure functions as a centralized system for propagating user identity across the digital advertising ecosystem. Google enables each approved advertising partner to recognize the same individual across Google-run auctions, link that individual to the partner's own tracking identifiers, and build user profiles informed by activity observed on unrelated third-party websites. Google thus occupies a central role not only in executing ad transactions, but also in coordinating the creation and exchange of

12

CLASS ACTION COMPLAINT

persistent user identifiers among ecosystem participants.

52.    Google has approved numerous third-party advertising entities to participate in its RTB ecosystem and to receive user data through the processes described above. Among those entities are companies that are owned by, controlled by, or affiliated with organizations headquartered in or subject to the jurisdiction of the People's Republic of China. Three such entities are relevant here: Pangle, operated by ByteDance Pte. Ltd.; MediaGo, operated by Baidu USA LLC; and Temu, operated by Whaleco Services, LLC.

53.    Baidu, Inc. is a Chinese technology company headquartered in Beijing and one of the largest internet companies operating in China. Baidu owns and operates MediaGo, a digital advertising platform managed through its subsidiary Baidu USA LLC. Baidu is subject to China's cybersecurity, data security, and national security legal frameworks, which may require cooperation with intelligence authorities and create a risk that user data will be accessed by the Chinese government.

54.    Temu is an online marketplace brand operated in the United States by Whaleco, Inc., a wholly owned subsidiary of PDD Holdings Inc. PDD Holdings exercises strategic and economic control over Temu's operations and maintains substantial business operations, personnel, and affiliated entities within the People's Republic of China. As a result, PDD Holdings is subject to Chinese law, including the National Intelligence Law, the Cybersecurity Law, and the Data Security Law, which may require cooperation with state intelligence authorities. In 2024, a coalition of twenty-one state attorneys general publicly warned about Temu's data practices and its obligations under Chinese law. In 2025, the attorneys general of Nebraska and Kentucky filed lawsuits alleging that Temu's mobile application operates as spyware.

55.    Lastly, ByteDance Ltd. is a Chinese technology company headquartered in the People's Republic of China and the parent company of TikTok. ByteDance's relationship with the Chinese government has been the subject of extensive congressional scrutiny, executive branch action, and proposed federal legislation. Within its advertising operations, ByteDance owns and operates Pangle, an advertising network that facilitates ad monetization across TikTok and affiliated third-party mobile applications. Pangle is operated by ByteDance Pte. Ltd., remains under ByteDance's ownership and

CLASS ACTION COMPLAINT

control, and is subject to Chinese legal regimes—including the National Intelligence Law, Cybersecurity Law, and Data Security Law—that can compel cooperation with government intelligence activities and create a risk of state access to private user data.

**F. Google's Cookie Syncing Mechanism Violates the BSDR**

56.    Google's advertising systems operate continuously and at enormous scale. Its real-time bidding and identifier-syncing infrastructure runs across thousands of websites, millions of users, and countless auctions each day, easily exceeding the 100,000-person threshold that defines "bulk" transfers under the BSDR.

57.    In the course of operating these tracking technologies, Google acquires users' electronic communications through advertising code embedded on publishers' websites and disseminates persistent identifiers—including IP addresses, cookie data, and Google's proprietary advertising identifier known as the Google GID—to advertising partners affiliated with Chinese companies through its RTB auction process.

58.    Google's transfers involve the combination of U.S. users' IP addresses and other network-level signals with persistent cookies and advertising identifiers such as the Google GID. These data elements constitute covered personal identifiers within the meaning of 28 C.F.R. § 202.212.

59.    Google's role within the advertising supply chain meets the BSDR's definition of data brokerage. Google receives user data indirectly through third-party publishers' websites and then transmits IP addresses, cookie data, and advertising identifiers to advertising partners that did not themselves collect or process that information directly from the individuals to whom it pertains.

60.    The Department of Justice's own regulatory illustrations confirm that advertising-related data transfers of this nature constitute prohibited data brokerage. For example, the DOJ explains that a U.S. company providing IP addresses and advertising identifiers of more than 100,000 U.S. users to an advertising exchange located in a country of concern as part of the sale of advertising space engages in a prohibited transaction. 28 C.F.R. § 202.214(b)(4); *see also* 28 C.F.R. § 202.214(b)(5) (when a U.S. advertising exchange provides the same data to advertisers headquartered in a country of concern—where those advertisers did not collect the data directly from users—the exchange's onward transfer constitutes

CLASS ACTION COMPLAINT

prohibited data brokerage).

61. As in this example, Google intercepts user data via embedded software on U.S. publishers' websites and transmits persistent identifiers and IP addresses to advertising partners that are headquartered in, or subject to the jurisdiction of, countries of concern. These transfers constitute prohibited data brokerage under 28 C.F.R. §§ 202.214 and 202.301(a).

62. As set forth above, Temu, Pangle, and MediaGo are each covered persons within the meaning of 28 C.F.R. § 202.211(a).

63. Because Google's data transfers qualify as data brokerage under 28 C.F.R. § 202.214 and involve both bulk sensitive personal data and covered persons, those transfers constitute prohibited covered data transactions under 28 C.F.R. §§ 202.210 and 202.301(a).

64. These violations inflict serious and concrete harm. Data transmitted through Google's advertising systems can be used by a foreign adversary to assemble detailed dossiers on U.S. residents, identify psychological, financial, or professional vulnerabilities, and single out individuals in sensitive positions. This threat is not theoretical. Google's bid requests may include content classification codes reflecting that a user is viewing material related to bankruptcy, mental health, substance abuse, sexual conditions, cancer, divorce, or specific religious traditions. Google's RTB infrastructure is also capable of transmitting data broker segments that label users as, among other categories, decision-makers in national security and international affairs, employees in aerospace manufacturing, active military personnel, or individuals likely to be judges. Additional segments classify users by income level, health conditions and prescription drug use, sexual orientation, ethnicity, political media consumption, and status as a minor.

65. When these classifications are linked to persistent identifiers and IP addresses, they permit a foreign adversary to associate named or identifiable individuals with their most sensitive online activity, health information, financial status, and professional roles. Investigative reporting has shown that RTB-derived data has been purchased on the commercial market and used to track the movements of U.S. military and intelligence personnel to sensitive facilities.

15

CLASS ACTION COMPLAINT

**PLAINTIFF'S EXPERIENCE**

66. Within the last year, Plaintiff Trisha Nadeau visited the Drugs.com website to research medications that her physician prescribed to her, which research included searching the name of the medications and reviewing related search results. From locations in or near her location in Dansville, Ms. Nadeau has accessed Drugs.com via the Google Chrome browser on her Windows computer and Android phone. After using Drugs.com, Ms. Nadeau has received advertisements on other websites related to the medical research she conducted on Drugs.com.

67. When Plaintiff visited Drugs.com, the website's code, as programmed by Defendant, caused Google's tracking technologies to be installed on Plaintiff's browsers. Google then used its tracking technologies, as described above, to collect Plaintiff's private communications, public IP address and other device fingerprint information, which it enriched with additional information and used for its own commercial purposes, including disclosures to MediaGo, Pangle, and Temu.

68. At no time when Plaintiff entered the website and viewed its contents did she authorize Defendant or consent to Defendant installing its tracking technologies on her internet browser, computer, or smartphone. Nor did she consent to Defendant collecting and using her private communications, IP addresses, and other information for its own commercial purposes, including enrichment and third-party advertising. Further, because Defendant did not provide notice or request permission, Plaintiff was unaware of and had no opportunity to opt out of that unauthorized disclosure and use of her data.

**CLASS ACTION ALLEGATIONS**

69. **Class Definitions**: Plaintiff brings this proposed class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of themselves and Classes of others similarly situated.

70. The Nationwide Class that Plaintiff seeks to represent is defined as follows:

> All individuals residing in the United States whose electronic communications with websites incorporating Google's advertising technology were intercepted and whose personal information was transmitted by Google to covered persons under 28 C.F.R. § 202.211, on or after April 8, 2025.

71. The Michigan Subclass that Plaintiff seeks to represent is defined as follows:

> All members of the Class who are residents of Michigan or whose electronic communications with websites incorporating Google's advertising technology

16

were transmitted from within Michigan.

72. Excluded from the Classes are: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest and its officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Classes; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; (6) registered users of the websites who were presented with and assented to the websites' Terms of Use and Privacy Policy during any registration processes; and (7) the legal representatives, successors, and assigns of any such excluded persons.

73. **Numerosity**: The exact number of members of the Classes ("Class Members") is unknown and not available to Plaintiff at this time, but it is clear that individual joinder is impracticable. Discovery will show that Defendant has surreptitiously collected and analyzed data from hundreds of thousands, if not millions, of consumers who fall into the definition of the Class. Class Members can be identified through Defendant's records.

74. **Commonality and Predominance**: There are many questions of law and fact common to the claims of Plaintiff and the putative Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not necessarily limited to the following:

> A. Whether Defendant read, attempted to read, or learned the content of the communications made by Plaintiff and the Class;
>
> B. Whether Defendant's actions were willful;
>
> C. Whether Defendant had the capability to and/or used Plaintiff's and the Class Members' communications for its own purposes;
>
> D. Whether Defendant transmitted persistent identifiers, including the Google GID, IP addresses, cookie data, device identifiers, and the contents of users' communications, to Pangle, MediaGo, Temu, or other entities in violation of the BSDR;

CLASS ACTION COMPLAINT

E.      Whether Defendant accessed Plaintiff's and the Class Members' computer systems; and

F.      Whether Defendant obtained consent from Plaintiff and Class Members.

75.     **Typicality**: Plaintiff's claims are typical of the claims of the Class Members in that Plaintiff, like all Class Members, has been injured by Defendant's misconduct at issue.

76.     **Adequate Representation**: Plaintiff will fairly and adequately represent and protect the interests of the Classes and has retained counsel competent and experienced in complex litigation and class actions. Plaintiff's claims are representative of the claims of the other members of the Classes. That is, Plaintiff and the Class Members sustained damages as a result of Defendant's conduct. Plaintiff also has no interests antagonistic to those of the Classes, and Defendant has no defenses unique to Plaintiff. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the members of the Classes and have the financial resources to do so. Plaintiff nor her counsel have any interest adverse to the Classes.

77.     **Superiority**: Class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy, as joinder of all members of the Classes is impracticable. Individual litigation would not be preferable to a class action because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. Economies of time, effort, and expense will be fostered, and uniformity of decisions will be ensured.

78.     Plaintiff reserves the right to revise the foregoing "Class Allegations" and definitions of the Classes based on facts learned through additional investigation and in discovery.

### FIRST CAUSE OF ACTION
**Violations of the Electronic Communications Privacy Act (18 U.S.C. § 2511)**
**(On Behalf of Plaintiff and the Nationwide Class)**

79.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

80.     The Electronic Communications Privacy Act ("ECPA") prohibits the intentional

18

CLASS ACTION COMPLAINT

interception of the content of any electronic communication. 18 U.S.C. § 2511.

81.    The ECPA protects both the sending and the receipt of communications.

82.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

83.    The transmission of Plaintiff and Class Members' website page visits and search terms, persistent identifiers, and other personal information to each website with Defendant's tracking technologies implemented on it each qualify as a "communication" under the ECPA's definition of 18 U.S.C. § 2510(12).

84.    The transmission of this information between Plaintiff and Class members and each website with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photo optical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(12).

85.    The ECPA defines "contents," when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. 18 U.S.C. § 2510(8).

86.    The ECPA defines an interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

87.    The ECPA defines "electronic, mechanical, or other device," as "any device…which can be used to intercept a[n]…electronic communication[.]" 18 U.S.C. § 2510(5).

88.    The following instruments constitute "devices" within the meaning of the ECPA:

- Defendant's tracking technologies implemented on the websites, as described above;

- Any other tracking code, SDK, or JavaScript snippets used by Defendant;

- Any cookies used by Defendant;

- The plan Defendant carried out to effectuate the tracking and interception of Plaintiff's and

19

CLASS ACTION COMPLAINT

Class Members' communications while they were using a web browser to navigate any of the websites with the tracking technologies implemented.

89. Plaintiff and Class Members' interactions with each website are electronic communications under the ECPA.

90. By utilizing its tracking technologies, as described herein, Defendant intentionally intercepted, endeavored to intercept, and/or procured another person to intercept, the electronic communications of Plaintiff and Class members in violation of 18 U.S.C. § 2511(1)(a).

91. Defendant intercepted communications that include, but are not limited to, communications to/from Plaintiff and Class members regarding their sensitive medical and health information. This confidential information is then added to consumer profiles and monetized for targeted advertising purposes, among other things, and shared with third parties, as alleged above.

92. By intentionally using, or endeavoring to use, the contents of Plaintiff's and Class Members' electronic communications, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendant violated 18 U.S.C. § 2511(1)(d).

93. Defendant intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a criminal or tortious act in violation of the Constitution or laws of the United States or of any state, namely, invasion of privacy, and violation of the BSDR, as alleged above.

94. The party exception in 18 U.S.C. § 2511(2)(d) does not permit a party that intercepts or causes interception to escape liability if the communication is intercepted for the purpose of committing any tortious or criminal act in violation of the Constitution or laws of the United States or of any State. Here, the association of Plaintiff's data with preexisting user profiles is a further use of Plaintiff's data that satisfies the crime-tort exception because it violate[s] state law, including invasion of privacy.

95. Defendant was not acting under the color of law to intercept Plaintiff's and Class members' wire or electronic communications.

20

CLASS ACTION COMPLAINT

96.     Plaintiff's and Class Members did not authorize Defendant to acquire the content of their communications for purposes of invading Plaintiff's and Class Members' privacy. Plaintiff and Class members had a reasonable expectation that Defendant would not intercept their communications for its own commercial benefit and for the benefit of third-parties without their knowledge or consent.

97.     The foregoing acts and omission therefore constitute numerous violations of 18 U.S.C. §§ 2511(1), *et seq*.

98.     As a result of each and every violation thereof, on behalf of themselves and the Class, Plaintiff seeks statutory damages of $10,000 or $100 per day for each violation of 18 U.S.C. §§ 2520(c)(2)(B).

**SECOND CAUSE OF ACTION**
**Invasion of Privacy, in Violation of MCL 750.539j**
**(On Behalf of Plaintiff and the Michigan Subclass)**

99.     Plaintiff incorporates the foregoing allegations as if fully set forth herein.

100.    Plaintiff and Class Members have a statutory privacy interest in their names, portraits, pictures, and voices under Michigan Law.

101.    Defendant knowingly used Plaintiff's and Class Members' names and other private information in the State of Michigan for advertising and trade purposes without first obtaining their written consent.

102.    Specifically, Defendant transmitted Plaintiff's and Class Members' names and/or FID to third parties like Pangle, MediaGo, and Temu for advertising and other commercial purposes, as described herein.

103.    Defendant's use of Plaintiff's and Class Members' names and private information did not serve any public interest.

104.    The unlawful tracking of Plaintiff and Class Members' and disclosure of their names in connection with their private information has caused Plaintiff and Class Members to suffer damages. This includes damage to the value of their information, which Defendant appropriated for its own enrichment. Plaintiff and Class Members have also suffered nominal damages.

105.    Defendant failed to protect Plaintiff's and Class Members' Private Information and acted

CLASS ACTION COMPLAINT

knowingly when it facilitated the installation of its tracking technologies onto websites such as Drugs.com because the purpose of the tracking technologies is to track and disseminate individual's communications with the Website for the purposes including but not limited to marketing and advertising.

106. Because Defendant intentionally and willfully incorporated its tracking technologies into websites, including those which users were likely to use for sensitive activity, such as Drugs.com, Defendant had notice and knew that its practices would cause injury to Plaintiff and Class Members.

107. Plaintiff, on behalf of herself and Class Members, seeks compensatory damages for Defendant's invasion of privacy, which includes the value of the privacy interest invaded by Defendant, loss of time and opportunity costs, plus prejudgment interest, and costs. Alternatively, Plaintiff and Class Members are entitled to nominal damages.

108. Plaintiff and Class Members have suffered an invasion of their privacy through the unauthorized interception of their electronic communications and the subsequent transmission of their persistent identifiers to foreign-controlled advertising entities. These communications included browsing activity on websites spanning sensitive categories including health, religion, parenting, finance, and many others. The interception and foreign transmission of these communications violated Plaintiff's and Class Members' reasonable expectation that their browsing activity and associated identifiers would not be intercepted nor transmitted to entities subject to the jurisdiction of foreign adversaries. Google's extensive interception and disclosure of Plaintiff's and Class Members' sensitive communications, online browsing activity, and identifying information would be highly offensive to a reasonable person and constitutes an egregious breach of social norms.

109. Once transmitted to entities affiliated with Chinese corporate groups, Plaintiff's and Class Members' identifiers and associated browsing data are beyond their control. Under Chinese law, including the National Intelligence Law, the Cybersecurity Law, and the Data Security Law, companies and individuals are required to cooperate with government surveillance efforts and grant authorities access to private user data. Plaintiff's and Class Members' data has been placed in the hands of entities subject to these compelled-disclosure obligations, creating an ongoing risk of foreign government surveillance and profiling.

CLASS ACTION COMPLAINT

110.    Plaintiff and Class Members have been deprived of the ability to control their sensitive personal information and to protect that information from entities identified by the U.S. government as threats to national security and the safety of U.S. citizens. Personal data, especially persistent identifiers that enable cross-site tracking and profiling, has significant commercial and intelligence value.

111.    Plaintiff and Class Members are entitled to exemplary and/or punitive damages because of Defendant's knowing violations of their statutory rights to privacy.

112.    Defendant's wrongful conduct will continue to cause great and irreparable injury to Plaintiff and the Class since their Private Information is still maintained by Defendant and still in the possession of various foreign states in violation of the BSDR and the wrongful disclosure of the information cannot be undone.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Trisha Nadeau, individually and on behalf of the proposed Classes, respectfully request that this Court:

(a)    An order certifying the Classes as defined above, appointing Trisha Nadeau as the representative of the Classes, and appointing her counsel as Class Counsel;

(b)    An order declaring that Defendant's actions, as set out above, violate 18 U.S.C. § 2511(1), *et seq*., and constitute a common law invasion of privacy; and

(c)    An award of statutory and compensatory damages, punitive damages, costs, and attorneys' fees.

Respectfully submitted,

**TRISHA NADEAU,** individually and on behalf of all others similarly situated,

Dated:    February 19, 2026        By: */s/ Matthew W. Ruan*
Matthew W. Ruan (SBN 264409)
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
mruan@fklmlaw.com

23

CLASS ACTION COMPLAINT

Jonathan M. Jagher (*pro hac vice* forthcoming)
**FREED KANNER LONDON & MILLEN LLC**
923 Fayette Street
Conshohocken, PA 19428
Telephone: (610) 234-6486
jjagher@fklmlaw.com

Nicholas R. Lange (*pro hac vice* forthcoming)
**FREED KANNER LONDON & MILLEN LLC**
100 Tri-State International, Suite 128
Lincolnshire, IL 60069
Telephone: (224) 632-4500
nlange@fklmlaw.com

*Counsel for Plaintiff and the Proposed Classes*

24

CLASS ACTION COMPLAINT